**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANTHONY J. SAMANGO, JR., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 17-2484 |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**Tucker, J.**                                                                                   **June 18, 2019**

Before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 28),

Defendant's Response in Opposition thereto (ECF No. 32), Defendant's Motion for Summary

Judgment (ECF No. 29), and Plaintiff's Response in Opposition thereto (ECF No. 31). For the

reasons stated in detail below, and upon consideration of the foregoing as well as Plaintiff's First

Amended Complaint (ECF No. 3), Defendant's Answer and Counterclaim (ECF No. 6), and

Plaintiff's Answer to the Counterclaim (ECF No. 7), Plaintiff's Motion for Summary Judgment

is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## I.        INTRODUCTION

The Parties have submitted cross-motions for summary judgment on the issue of whether

the IRS properly determined that Plaintiff—who at various times held himself out to be the

owner, president, and corporate officer with oversight over "entire operations on a daily basis"[1]

of a construction company known as SS Frames—is a person responsible for over $900,000.00

in SS Frames's unpaid employee withholding taxes. As set forth below, the Court concludes that

based on the undisputed facts in this case, the IRS has, indeed, properly determined that Plaintiff

---

[1] Gov't's Mot. Summ. J. Ex. 3, at 2, ECF No. 29-8.

is a responsible person because Plaintiff has not adduced any evidence to rebut the automatic presumption of correctness of the personal tax assessment against him.

At the outset, the Court notes that the tax assessment at issue arises under 26 U.S.C. §§ 3102, 3402, and 7501(a). These sections "require employers to withhold federal social security and income taxes from the wages of their employees" and then to hold those taxes "in trust" for the benefit of the United States of America. *Greenberg v. United States*, 46 F.3d 239, 242 (3d Cir. 1994) (citing 26 U.S.C. §§ 3102, 3402, and 7501(a)).

When employers fail to hold such funds in trust in accordance with the law, the IRS may recover the unpaid trust funds from a person who is legally responsible for the failure to withhold the taxes. *Id.* The IRS is authorized under 26 U.S.C. § 6672 to impose a "penalty" on a responsible person for up to 100 percent of the value of unpaid taxes. *Id.* Such penalties are sometimes called "trust fund recovery penalties." *See, e.g.*, First Am. Compl. ¶ 15, ECF No. 3. While the language of § 6672 denotes the tax assessed against such a taxpayer as a "penalty," the assessment is more appropriately conceived of as a civil tool for recovering unpaid taxes. *See, e.g.*, *Goodman v. United States*, No. 74-666, 1978 WL 4516, at *5 (D.N.J. Jun. 30, 1978) (stating that "[a]lthough called a penalty, it is, in substance, a tax."). In some cases, the United States may, under 26 U.S.C. §§ 7201 and 7202, pursue criminal charges against a person responsible for nonpayment of trust fund taxes, but such criminal charges are not at issue here. Rather, this case involves a civil trust fund recovery penalty.

With this context in mind, the Court will next provide a factual and procedural history based on the undisputed facts in this case before turning to the legal analysis supporting the Court's conclusion that the Plaintiff cannot carry his burden of showing that the IRS's tax assessment against him is incorrect.

## II.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.      Plaintiff As President And Sole Owner Of Carson Concrete

From 2000 to about 2016, Plaintiff was the sole shareholder and president of Carson Concrete—a concrete construction company.[2]  As the president of Carson Concrete, Plaintiff had, by his own admission, "[o]versight of everything."[3]  His oversight included, for example, reviewing and signing all federal and state tax returns for Carson Concrete, which were prepared by an accounting firm with the assistance of Carson Concrete's twenty-year veteran controller, Robert Artz.[4]

### B.      Carson Concrete Hires SS Frames As Subcontractor; SS Frames Uses Carson Concrete's Address and Phone Number, And Employees

In 2008, while Plaintiff was president of Carson Concrete, Carson Concrete bid for and won a construction contract to build a dormitory for Drexel University at 34th and Powelton Streets in Philadelphia.[5]  To perform this work, Carson Concrete subcontracted for labor from another construction company known as SS Frames.[6]

The decision to hire SS Frames—a company that Plaintiff described as having "little experience"[7] and in which Plaintiff was "a minority shareholder from [its] inception"[8]—was

---

[2] Samango Dep. 32–33, ECF No. 28-2.

[3] Samango Dep. 34:5–7.

[4] Samango Dep. 34–35 (Plaintiff testifying that he signed federal and state tax returns while Robert Artz assembled information for an accounting firm to prepare tax returns for Plaintiff's review and signature); Samango Dep. 25:2–6 (testifying that Robert Artz was Carson Concrete's controller for twenty years).

[5] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 44, ECF No. 31 (stating that "Plaintiff does *not* dispute" that Carson Concrete began work on a Drexel University project in 2008); Samango Dep. 131:1–13 (testifying that in 2008, Drexel University hired Carson Concrete to build a dormitory).

[6] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 44 (stating that "Plaintiff does *not* dispute" that Carson Concrete subcontracted with SS Frames).

[7] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 26, ECF No. 31 (describing SS Frames as having "little experience").

[8] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 30.

grounded in Plaintiff's desire to use SS Frames's lack of workplace injury history to obtain "cheaper insurance premiums."[9]  Indeed, Carson Concrete had a history of worker injuries, including a $400,000 worker fall injury, which increased Carson Concrete's "insurance modifier."[10]  Thus, in subcontracting labor from SS Frames, a nascent company with no worker injury history, Carson Concrete could obtain cheaper insurance.[11]

SS Frames maintained its business address at 625 W. Ridge Pike, Suite A104, Conshohocken, PA—which was also the business address of Carson Concrete and where Plaintiff maintained his own office.[12]  SS Frames also used the same business phone number as Carson Concrete.[13]  Later, when Carson Concrete moved its offices from Conshohocken, PA to 5 Creek Parkway in Boothwyn, PA, SS Frames also changed its address to 5 Creek Parkway in Boothwyn, PA.[14]  Despite Plaintiff's representations that SS Frames "had little experience,"[15] the number of employees at SS Frames belied the relative complexity of its business in which it managed a fluctuating workforce dependent on the availability of work.  SS Frames had

---

[9] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 27, ECF No. 31.

[10] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 28, ECF No. 31; Samango Dep. 115:1–18, ECF No. 28-2 (testifying that a worker "fell from the deck" and that the fall "resulted in about a $400,000 loss" to Carson Concrete).

[11] Samango Dep. 78:15–24.

[12] Samango Dep. 52:5–9.

[13] Samango Dep. 81:4–12; Gov't's Mot. Summ. J. Ex. 4, ECF No. 29-9 (showing SS Frames' phone number to be 610-825-8600, which Plaintiff confirmed in his deposition was the phone number used by Carson Concrete); *see also* Gov't's Mot. Summ. J. Ex. 20, ECF No. 29-25 (showing one of SS Frames's phone numbers as "610-494-7700"); Samango Dep. 68:3–14 (testifying that "I told you, the [Carson Concrete] phone number was 7700 . . . . I don't look at the phone numbers.  I dial 7700.").

[14] Samango Dep. 48:2–16 (testifying that Carson Concrete moved from Conshohocken, PA to Boothwyn, PA by the fall of 2008).

[15] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 26.

anywhere between nine employees, in slow times, and forty or forty-six employees in busy times.[16]

The similarities between Carson Concrete and SS Frames did not, however, stop at shared business addresses, shared phone numbers, and shared work on the Drexel University dormitory project; in many cases, the two companies shared top-level management and employees.

Broadly, the two companies operated in a way that demonstrated to some state authorities the existence of "an interchange of labor."[17] For example, in 2008, Carson Concrete reported SS Frames's employees' wages as Carson Concrete wages to state authorities, but otherwise reported claims for State Workers' Insurance Fund coverage by those same employees as attributable to SS Frames.[18] Other examples of shared employment included Carson Concrete's project superintendent, John Lewis, who worked for both Carson Concrete and SS Frames.[19] For example, in 2008, and in connection with the Drexel University project, John Lewis worked for SS Frames as a project supervisor on the Drexel University project.[20]

---

[16] Samango Dep. 85–88, ECF No. 28-2 (testifying about staffing levels at SS Frames); Samango Dep. 135 (reviewing documents showing that SS Frames had up to forty-six workers during certain times in 2008).

[17] Marrazzo Dep. 80:7–22, ECF No. 29-23 (testifying as a Pennsylvania State Workers' Insurance Fund audit manager with thirty-one years of experience that claims for coverage were submitted "under SS Frames" that were for "employees for Carson Concrete Corporation" and that this showed "an interchange of labor." Indeed, claims for insurance coverage were "reported under SS Frames" but "the wages for the claimants were reported under Carson Concrete.").

[18] Marrazzo Dep. 80:7–22.

[19] Samango Dep. 39:13–22 (testifying that "John Lewis is a former employee" of Carson Concrete and that Lewis served as a "project superintendent").

[20] Samango Dep. 131:6–21 (testifying that in 2008, as Carson Concrete and SS Frames were working on the Drexel University project, John Lewis "must have been an employee of SS Frames").

Not only did John Lewis work for both Carson Concrete and SS Frames in the 2008 timeframe, but Carson Concrete's twenty-year veteran controller, Robert Artz, also performed work for both companies. In various documents, SS Frames listed Robert Artz as its "[c]ontact [p]erson" for Pennsylvania State Worker's Insurance Fund audit purposes.[21] In fact, SS Frames listed Artz as a SS Frames contact person in documents verified and signed by Plaintiff, by 2008, had taken on the mantel of management at SS Frames as president.[22]

### C. Plaintiff Becomes President of SS Frames; Plaintiff Submits Federal Tax Forms On Behalf Of SS Frames, Pennsylvania State Unemployment Compensation Forms; Communicates With State Authorities While Representing That He Was 100 Percent Owner Of SS Frames

At some time in 2008, but by no later than mid-January, Plaintiff, while working as the president of Carson Concrete also started working as the president of SS Frames.[23] It was, perhaps, not surprising that Plaintiff assumed the position of president of SS Frames since "from the inception of the Corporation" Plaintiff had been nothing less than "a minority shareholder" of

---

[21] Gov't Mot. Summ. J. Ex. 3, at Bates No. USA0444, ECF No. 29-8 (listing Robert Artz as the person to contact for audit information relating to SS Frames); Gov't's Mot. Summ. J. Ex. 8, ECF No. 29-13 (listing Robert Artz as contact person for SS Frames's State Worker's Insurance Fund Audit).

[22] Gov't Mot. Summ. J. Ex. 3, at Bates No. USA0444–USA0446 (showing Robert Artz as an SS Frames point of contact and showing Plaintiff signing, under penalty of state law, as the president of SS Frames); Samango Dep. 117:17–23, ECF No. 28-2 (testifying that Robert Artz "works all day for" Plaintiff).

[23] Samango Dep. 51:16–21(testifying that by January 2008, Plaintiff was the president of SS Frames); Gov't's Mot. Summ. J. Ex 3, ECF No. 29-8 (showing Plaintiff represented under possible penalty of state law that he was "Pre[s]ident" of SS Frames by January 18, 2008); Gov't's Mot. Summ. J. Ex. 4, ECF No. 29-9 (Application for Executive Officer Exception) (showing that Plaintiff represented to the Pennsylvania Commonwealth Department of Labor and Industry that he was an "[e]xecutive [o]fficer" and "PRESIDENT" of SS Frames Corporation as of February 15, 2008); Gov't's Mot. Summ. J. Ex. 5, ECF No. 29-10 (showing that Plaintiff represented on a Pennsylvania Unemployment Compensation Quarterly Tax Form for the tax quarter for January 2009 that he was the "President" of SS Frames Corp.); Gov't's Mot. Summ. J. Ex. 14, ECF No. 29-19 (showing that as of December 30, 2008, Plaintiff was the "100.0%" owner and "PRE[SI]DENT" of "SS FRAMES CORP.").

SS Frames.[24]  From 2008 onward, Plaintiff, while sometimes assuming the title president, and in others "manager," approved, signed, and submitted a variety of forms and documents to federal and state authorities on behalf of SS Frames.

For example, on January 18, 2008, Plaintiff approved, signed under penalty of state law, and submitted an "Application for Workers' Compensation Coverage" to the Pennsylvania Department of Labor and Industry.[25]  In signing this application, Plaintiff represented to the Department of Labor and Industry that he was "President" of SS Frames, he owned "100" percent of the "corporation," and he "oversees [SS Frames's] entire operations on a daily basis."[26]  Plaintiff further certified answers to a slew of questions relating to SS Frames's business including that: SS Frames "[p]oured in place and [performed] flat work concrete construction," SS Frames did not "utilize the services of subcontractors, owner-operators, and/or independent contractors," SS Frames had never "had previous workers compensation coverage in Pennsylvania, and SS Frames maintained "10" employees in connection with "[c]oncrete [c]onstruction" at a cost of "$175,000.00" per "12 Month Policy Period" and "20" employees in connection with "[c]oncrete [f]lat [w]ork" at a cost of $425,000.00 per "12 Month Policy Period."[27]

Then, about a month later, on February 15, 2008, Plaintiff again approved, signed under penalty of state law, and submitted an "Application for Executive Officer Exception" to the Pennsylvania Department of Labor and Industry in connection with SS Frames's earlier application for workers' compensation insurance.[28]

_____

[24] First Am. Compl. ¶ 30, ECF No. 3.
[25] Gov't's Mot. Summ. J. Ex. 3, ECF No. 29-8.
[26] Gov't's Mot. Summ. J. Ex. 3, ECF No. 29-8 (emphasis added).
[27] Gov't's Mot. Summ. J. Ex. 3, ECF No. 29-8.
[28] Gov't's Mot. Summ. J. Ex. 4, ECF No. 29-9.

In the months that followed, Plaintiff continued his work as SS Frames's president such that on April 29, 2009, Plaintiff approved, signed, and submitted a Pennsylvania Quarterly Tax Form on behalf of SS Frames.[29] This Pennsylvania Quarterly Tax Form, signed by Plaintiff in his capacity as SS Frames's president, was delivered to the Pennsylvania Department of Labor and Industry's State Worker's Insurance Fund under an SS Frames fax coversheet.[30] In submitting this form, Plaintiff certified certain information about SS Frames including that: in the first month of the first quarter of 2009, SS Frames had forty "total covered employees," that the number of employees decreased to twenty-eight in the second month, and then decreased again to nine employees by the third month.[31] Plaintiff also supplied information on SS Frames's gross wages—$470,874.26—and confirmed that SS Frames owed $38,927.38 to the Pennsylvania Unemployment Compensation Fund.[32] In fact, while Plaintiff was serving as the president of Carson Concrete and SS Frames, Plaintiff issued checks from a Carson Concrete account to pay state authorities for liabilities incurred by SS Frames for unpaid unemployment compensation insurance. Among these payments was a check, signed by Plaintiff from a Carson Concrete Account in the amount of $17,568.46 to pay off an SS Frames liability.[33]

---

[29] Gov't Mot. Summ. J. Ex. 5, ECF No. 29-10; Samango Dep. 85:8–15, ECF No. 28-2 (confirming that Plaintiff signed the tax form, which was introduced at the deposition as Government Exhibit 22 and then again as Government Exhibit 23); Samango Dep. 95:13–22 (explaining that Government Exhibit 23, with a fax coversheet, had previously been identified as Exhibit 22, without the fax coversheet).

[30] Gov't Mot. Summ. J. Ex. 5.

[31] Gov't Mot. Summ. J. Ex. 5.

[32] Gov't Mot. Summ. J. Ex. 5.

[33] Samango Dep. Vol II, 52:23–54:1, ECF No. 29-22 (testifying that Carson Concrete sometimes paid expenses incurred by SS Frames directly and "offset" the amount Carson Concrete paid from the "gross bills" from SS Frames); Samango Dep. 88:17–89:14, ECF No. 28-2 (testifying that Plaintiff signed a check in the amount of $17,568.46 to pay a SS Frames liability for SS Frames's unemployment compensation).

That Plaintiff was enmeshed with SS Frames's business was confirmed again, in 2012, by Plaintiff himself when he approved, signed under penalty of perjury, and submitted an IRS federal form 940 ("Form 940")[34] on behalf of SS Frames as SS Frames's "manager."[35] In connection with this Form 940, Plaintiff chose to retain sole authority to speak on behalf of SS Frames.[36] Once again, Plaintiff provided certified information about SS Frames to a governmental agency including: the total payments that SS Frames made to all employees in 2011—$2,253,814.48—and that Plaintiff could be reached at "610-494-7700," which Plaintiff testified in his deposition was a Carson Concrete phone number that he dialed himself.[37]

Not surprisingly, given Plaintiff's consistent representations to state authorities over the years that he owned SS Frames and was its president and manager with daily oversight and supervision of its operations, the Pennsylvania Unemployment Tax Office maintained records showing that Plaintiff was the "[o]wner/[r]esponsible [p]arty" for SS Frames and was the president and "100.0%" owner of the company.[38]

---

[34] Form 940 is used "to report your annual Federal Unemployment Tax Act (FUTA) tax. Together with state unemployment tax systems, the FUTA tax provides funds for paying unemployment compensation to workers who have lost their jobs." About Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, IRS, https://www.irs.gov/forms-pubs/about-form-940 (last visited June 14, 2019).

[35] Gov't's Mot. Summ. J. Ex. 20, ECF No. 29-25

[36] Gov't's Mot. Summ. J. Ex. 20 (showing that Plaintiff was the only person that the IRS was permitted to speak to about the Form 940 because Plaintiff refused to authorize a "third-party designee").

[37] Compare Gov't's Mot. Summ. J. Ex. 20, ECF No. 29-25 (listing SS Frames's daytime phone as "610-494-7700") with Samango Dep. 68:3–14, ECF No. 28-2 (testifying that "I told you, the [Carson Concrete] phone number was 7700 . . . . I don't look at the phone numbers. I dial 7700.").

[38] Gov't's Mot. Summ. J. Ex. 14, ECF No. 29-19; see also Gov't's Mot. Summ. J. Ex. 7, ECF No. 29-12 (Pennsylvania State Workers' Insurance Fund audit manager's notes showing that state authorities understood that Carson concrete and SS Frames "majority ownership is identical.").

### D. IRS Assesses SS Frames's Unpaid Withholding Taxes Penalty Against Plaintiff As A Person Responsible For Such Taxes; Revenue Officer Kevin Reed's Investigation

On September 12, 2014, the IRS assessed a trust fund recovery penalty against Plaintiff, under 26 U.S.C. § 6672, in the amount of $878,298.18.[39] At that time, the IRS determined that Plaintiff was responsible for unpaid federal employee withholding taxes due from SS Frames for the four tax quarters in 2008 during which time SS Frames had been working directly for Carson Concrete on the Drexel University project and during which time Plaintiff had been acting as SS Frames's president with oversight over "entire operations on a daily basis"[40]

Before imposing the tax assessment on Plaintiff, Revenue Officer Kevin Reed, who was assigned to the case, searched the IRS's Integrated Data System ("IDRS")—a database system that contains taxpayer records and "cross-reference" information to identify a corporate taxpayer's possible corporate officers[41]—and found that Plaintiff's social security number was listed as a possible responsible corporate officer at SS Frames.[42] Having identified Plaintiff as a possible responsible corporate officer, Officer Reed continued his investigation by conducting a field call to meet with SS Frames's leadership to discuss its unpaid taxes.

Officer Reed traveled to the Carson Concrete/SS Frames business address where he asked to speak with Plaintiff in connection with SS Frames.[43] Officer Reed met with Plaintiff who said

---

[39] Gov't Mot. Summ. J. ¶ 1, ECF No. 29-1; First Am. Compl. ¶ 1, ECF No. 3; Answer ¶ 1, ECF No. 6.

[40] Gov't Mot. Summ. J. Ex. 3, at 2, ECF No. 29-8.

[41] Reed Dep. 34–35, ECF No. 28-10. Officer Reed generally explained that the IDRS database contains a breadth of information that may be helpful in a revenue officer's investigation into who may be a responsible person for unpaid taxes. Among other information available on the IDRS database is: "partial copies of returns," information about a taxpayer's "income," "federal tax deposits," "officer information, such as their Social Security numbers," officers' "[a]ddress, phone numbers," any "power of attorney," and an accounting of what balances might be due for any tax periods. Reed Dep. 34–36.

[42] Reed Dep. 48:11–21, 51–52.

[43] Reed Dep. 56:1–14.

that while Plaintiff had "heard of [SS Frames] he was not sure if he was an officer, and at that point, [Plaintiff] did not want to speak to [Officer Reed] anymore."[44]  After the field call, Officer Reed issued an administrative summons to Wells Fargo for bank records relating to SS Frames[45] and a set of IRS "4180 Appointment Letters" to Plaintiff and SS Frames's point of contact/Carson Concrete's controller, Robert Artz, asking them to produce records or other documents relating to the imposition of an assessment against Plaintiff.[46]  IRS 4180 Appointment Letters ("IRS 4180 Summons") are "summons[es] for information"[47] and take the form of an in-person interview in which the Revenue Officer administers a "questionnaire" to the recipient.[48]  The questionnaire consists of a series of questions aimed at understanding the recipient's "roles and responsibilities."[49]  Despite the IRS 4180 Summonses, neither Plaintiff nor Robert Artz appeared for their interviews.[50]

Having received no response to the IRS 4180 Summonses, Officer Reed then notified Plaintiff of the proposed tax assessment against him by providing Plaintiff with an IRS Form 1153 by certified mail.[51]  IRS Form 1153 is a "proposed assessment" that is "sent out [by] certified [mail] or [by] hand deliver[y]."[52]  As with the IRS 4180 Summonses, Plaintiff failed to

---

[44] Reed Dep. 56:7–14, ECF No. 28-10; *but see* Samango Dep. 129:7–10, ECF No. 28-2 (testifying that he heard Plaintiff state that he "know[s] the name, but I don't believe I ever spoke with him.").
[45] Reed Dep. 55:6–9 (testifying to issuing summons to Wells Fargo).
[46] Reed Dep. 55:12–20 (testifying to issuing IRS 4180 Summonses to Artz and Plaintiff).
[47] Reed Dep. 15:1–4.
[48] Reed Dep. 18:9–11.
[49] Reed Dep. 18:19.
[50] Reed Dep. 74:18–20.
[51] Reed Dep. 74:21–24.
[52] Reed Dep. 31:2–4.

respond to the IRS Form 1153 notice of proposed assessment.[53]  The IRS then formally imposed the tax assessment on Plaintiff.[54]

It was after the IRS imposed its formal assessment that Plaintiff then actively involved himself in the assessment process by submitting an appeal of the assessment.[55]  The IRS denied Plaintiff's appeal and affirmed the tax assessment.[56]

E.    **IRS Files Tax Liens; Plaintiff Files Petition For Refund And Abatement With IRS; Files This Lawsuit**

On December 15, 2014, the IRS recorded a notice of federal tax lien against Plaintiff based on the 2008 tax assessment and on a separate 2009 tax assessment.[57]

By no later than May 2016, in response to the tax liens and to force the release of the liens, Plaintiff initiated a claim for refund and request for abatement of both the 2008 tax assessment and the distinct 2009 tax assessment.[58]

As part of Plaintiff's request for refund and abatement of the two tax assessments, shortly after filing his claim, Plaintiff met in person with Revenue Officer Kerry Martin.[59]  At this meeting, Plaintiff represented to Officer Martin that he "had no knowledge of [SS Frames] and didn't know where the assessment was coming from."[60]  Based on Plaintiff's representations and Officer Martin's misperception that "it would be kind of hard for [the IRS] to try to pursue

---

[53] Reed Dep. 43:24–44:2, 74:25–75:2.
[54] Gov't's Mot. Summ. J. ¶ 1, ECF No. 29-1; First Am. Compl. ¶ 1, ECF No. 3; Answer ¶ 1, ECF No. 6.
[55] Samango Dep. 13–14, ECF No. 28-2.
[56] Reed Dep. 75:4–6, ECF No. 28-10.
[57] First Am. Compl. ¶ 26, ECF No. 3 (stating that the IRS also issued a separate tax assessment to and recorded tax lien against Plaintiff for $254,924.43 in unpaid SS Frames taxes for the 2009 tax year).
[58] First Am. Compl. ¶ 24.
[59] Samango Dep. 125–26, ECF No. 28-2.
[60] Martin Dep. 44:12–17, ECF No. 28-8.

collections" where there was no "file,"[61] Officer Martin recommended that the tax assessments be abated.[62]  On Officer Martin's recommendation, the 2009 tax assessment was abated and, later, on August 24, 2017, the IRS released the tax lien that was based on the now-abated 2009 tax assessment.[63]  The 2008 tax assessment—the tax assessment at issue in this case—remained in effect as did the tax lien.[64]

Later, Officer Martin learned that while there was no IRS "file" containing "documents" associated with the 2008 and 2009 tax assessments, the tax assessments were otherwise supported by documents including a file created and maintained by Pennsylvania state authorities.[65]  By this time, however, and despite an attempt to reinstate the abated 2009 assessment, Officer Martin was unable to rectify the error.[66]

As for the 2008 tax assessment, by letter dated August 31, 2016, the IRS denied Plaintiff's claim for refund and abatement.[67]  Dissatisfied with this decision, on June 2, 2017, Plaintiff filed suit in this Court alleging that the IRS misidentified him as a person responsible for SS Frames's unpaid employee withholding taxes because "[o]ther than obtaining a minority interest in SS Frames for the purposes of assisting with local State Workers' Insurance Fund

---

[61] Plaintiff makes much of the concept that there was no file, but as explained in detail in Section IV.B.1, below, that there may have been "no file" does not mean that the assessment was "naked."

[62] Martin Dep. 44–45.

[63] Gov't's Mot. Summ. J. Ex. 13, ECF No. 29-18 (Internal Revenue Service Facsimile Release of Tax Lien); Pl.'s Mot. Summ. J. Ex. G, ECF No. 28-9 (Certificate of Release of Federal Tax Lien).

[64] Martin Dep. 45:6–9, ECF No. 28-8 (testifying that while he recommended that "both assessments" be abated, "only one got abated, which was the 2009 period"); Martin Dep. 45:6–9, 46:9–10 (testifying that the "2008 [assessment] stayed").

[65] Martin Dep. 45–46.

[66] Martin Dep. 46:4–17 (explaining that after first abating the 2009 tax assessment, Officer Martin discovered evidence that he was initially unaware of that supported the 2009 tax assessment, but that by the time of his discovery, he no longer had authority to reinstate the abated 2009 tax assessment).

[67] First Am. Compl. Ex. B, ECF No. 3-4.

negotiation and troubleshooting, [Plaintiff] had no knowledge as to SS Frames' finances, operations or general decision-making, and he exercised no such powers or authority."[68]

Plaintiff timely filed a First Amended Complaint to which the Government filed an Answer and Counterclaim.[69] By its Answer and Counterclaim, the Government requests that the Court reduce the 2008 tax assessment to judgment with interest.

The Parties then filed cross-motions for summary judgment, which are ripe for disposition.

## III.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment in favor of the moving party only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is "material" if it is "one that might 'affect the outcome of the suit under governing law.'" *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to a material fact is "genuine" if it "is one that 'may reasonably be resolved in favor of either party.'" *Lomando v. United States*, 667 F.3d 363, 371 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 250).

The movant has the initial "burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). When assessing a motion for summary judgment, the court "must construe all evidence in the light most favorable to the nonmoving party." *Id.*

The standard of review for cross-motions for summary judgment is identical to the standard applicable to routine motions for summary judgment. *Lawrence v. City of Phila.*, 527

---

[68] *See generally* Compl., ECF No. 1.
[69] Answer with Counterclaim, ECF No. 6.

F.3d 299, 310 (3d Cir. 2008) (citing *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.

1968)). "When confronted with cross-motions for summary judgment . . . 'the court must rule on

each party's motion on an individual and separate basis, determining, for each side, whether a

judgment may be entered in accordance with the summary judgment standard.'" *Arsdel v.

Liberty Life Assurance Co. of Bos.*, 267 F. Supp. 3d 538, 545 (E.D. Pa. 2017) (citing *Erbe v.

Conn. Gen. Life Ins. Co.*, No. Civ. A. 06-113, 2009 WL 605836, at *1 (W.D. Pa. Mar. 9, 2009)).

## IV.    DISCUSSION

### A.    De Novo Nature Of Tax Refund Cases; Presumption Of Correctness Of IRS Assessment; Burden Of Proof On Taxpayer

#### 1.    De Novo Proceedings

Taxpayer refund suits are de novo proceedings. *Wells Fargo & Co. and Subsidiaries v.

United States*, 91 Fed. Cl. 35, 75 (Fed. Cl. 2010) (stating that "[t]he Court conducts a de novo

review in tax refund suits"); *Cook v. United States*, 46 Fed. Cl. 110, 113 (Fed. Cl. 2000) (stating

that "[i]n tax refund suits, factual issues are tried de novo . . . with no weight given to subsidiary

factual findings made by the Service in its internal administrative proceedings."); *De Simone v.

United States*, 2009 WL 5173498, *3 (citing *R.E. Dietz Corp. v. United States*, 939 F.2d 1 (2d

Cir. 1991)) (applying a de novo standard of review).  As a de novo proceeding, the district court

is ordinarily not permitted "to delve into the [IRS's] reasoning at the administrative decision-

making level." *De Simone*, 2009 WL 5173498 at *4.  In other words, "the court does not sit in

judgment of the [IRS]; the court places itself in the shoes of the [IRS]." *Id.* (citing *R.E. Dietz

Corp.*, 939 F.2d at 5).   Thus, if "admissible evidence exists to support the [IRS's] assessment . . .

. it is irrelevant whether it is the same evidence that the [IRS] relied upon in originally making its

assessment." *Greco*, 380 F. Supp. 2d 598, 613 (M.D. Pa. 2005).

2.      **Rebuttable Presumption Of Correctness Of IRS Assessment; Burden Rests On Taxpayer To Prove Assessment Is Invalid**

In de novo tax refund proceedings such as this, an automatic rebuttable presumption of correctness arises when the Government certifies an IRS tax assessment against a taxpayer. *Psaty v. United States*, 442 F.2d 1154, 1159 (3d Cir. 1971). The Third Circuit has explained that the rebuttable presumption "is a procedural device that places the burden of producing evidence to rebut the presumption on the taxpayer." *Anastasato v. C.I.R.*, 794 F.2d 884, 886 (3d Cir. 1986). This presumption exists both for practical and policy reasons. As a practical matter, the presumption is based on the reality that an IRS tax assessment is generally correct. *Psaty*, 442 F.2d at 1160 (stating that "[o]nce [a] tax is assessed a rebuttable presumption arises based, in part, on the probability of its correctness."). As a policy matter, the presumption prompts taxpayers "to meet certain bookkeeping obligations placed upon [the taxpayer] by the [tax] Code" and recognizes that "the taxpayer has more readily available to him the correct facts and figures." *Id.* (citing *United States v. Lease*, 346 F.2d 696 (2d Cir. 1965)). The presumption also "appropriately request that corporate officers explain their failure to perform duties imposed upon them by law." *Id.*

Once the Government introduces evidence of a certified tax assessment, which raises the presumption of correctness, the <u>burden shifts to the taxpayer</u> to show by a preponderance of the evidence "either (1) that he was not a responsible person within the meaning of the statute, or (2) that he did not willfully fail to pay the amount due to the IRS." *Brounstein v. United States*, 979 F.2d 952, 954 (3d Cir. 1992) (citing *Quattrone Accountants, Inc. v. IRS*, 895 F.2d 921, 927 (3d Cir. 1990)). The burden also rests <u>on the taxpayer even with respect to any counterclaim</u> by the Government. *Psaty*, 442 F.2d at 1160 (the Third Circuit writing that "we hold therefore that when the Government offers in evidence the certification of the Commissioner's assessment in

support of the counterclaim, the presumption of correctness operates to place upon the taxpayer both the burden of going forward and the burden of persuasion.").

### 3. Responsible Person

A "responsible person," under 26 U.S.C. § 6672, is "a person required to collect, truthfully account for or pay over any tax." *Quattrone Accountants, Inc.*, 895 F.2d at 927 (citing *Slodov v. United States*, 436 U.S. 238 (1978)). The Third Circuit has explained that:

> Responsibility is a matter of status, duty or authority, not knowledge . . . . [thus, a] responsible person need not be a corporate officer . . . . [and, indeed, a] person is responsible if the person has significant, though not necessarily exclusive, control over the employer's finances. A person has significant control if he has the final or significant word over which bills or creditors get paid.

*Id.* (internal citations omitted) (emphasis added). In deciding whether a person is "responsible," courts consider a non-exhaustive list of factors including:

> (1) contents of the corporate bylaws, (2) ability to sign checks on the company's bank account, (3) signature on the employer's federal quarterly and other tax returns, (4) payment of other creditors in lieu of the United States, (5) identity of officers, directors, and principal stockholders in the firm, (6) identity of individuals in charge of hiring and discharging employees, and (7) identity of individuals in charge of the firm's financial affairs.

*Greenberg v. United States*, 46 F.3d 239, 243 (3d Cir. 1994).

### 4. Willfulness

"Under section 6672(a), willfulness is 'a voluntary, conscious and intentional decision to prefer other creditors over the Government.' A responsible person acts willfully when he pays other creditors in preference to the IRS knowing that taxes are due, or with reckless disregard for whether taxes have been paid." *Brounstein*, 979 F.2d at 955–56 (quoting *Quattrone*, 895 F.2d at 928 (internal citation omitted)). Reckless disregard, in turn, exists where a responsible taxpayer "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not

being paid and if (3) he was in a position to find out for certain very easily." *United States v. Vespe*, 868 F.2d 1328, 1335 (3d Cir. 1989) (internal quotation omitted).

### 5. Naked Assessments Not Entitled To Presumption Of Correctness

In rare situations, however, the introduction of a certified tax assessment may not raise the usual presumption of correctness where the assessment is, despite certification, a "naked assessment without factual foundation." *Anastasato*, 794 F.2d at 887 (citing *Weimerskirch v. Comm'r*, 596 F.2d 358 (9th Cir. 1979)). Naked assessments are those "without <u>any</u> foundation whatsoever." *United States v. Janis*, 428 U.S. 433, 441 (1976) (emphasis added). "[A]n assessment is 'naked' and 'beyond saving' when []the records supporting an assessment are excluded from evidence, . . . or are nonexistent." *Cook*, 46 Fed. Cl. at 114. Of course, when considering whether an assessment is naked, courts must be mindful that "what is critical, given the de novo nature of [tax refund] proceedings, is that admissible evidence exists to support the assessment . . . . [and] it is irrelevant whether it is the same evidence that the [IRS] relied upon in originally making its assessment." *Id.* Accordingly, "courts have repeatedly held that the government may support a tax assessment based on any admissible evidence, <u>including that first disclosed in discovery</u>, and . . . <u>need not rely solely, or at all, on the evidence reviewed administratively by the [IRS]</u>. *Id.* (citing *Tucker v. United States*, 8 Cl. Ct. 180, 187–88 (Cl. Ct. 1985), *modified on other grounds*, 8 Cl. Ct. 575 (Cl. Ct. 1985) (emphasis added).

### B. Plaintiff Has Not Adduced Evidence To Allow A Jury To Conclude That He Has Rebutted The Presumption Of Correctness

Having set forth the legal principles applicable in this case, the Court turns to the facts presented and concludes that: (1) the tax assessment in this case is not a "naked assessment" and, therefore, the usual presumption of correctness of the tax assessment applies, and (2) Plaintiff has not adduced any evidence that would permit a jury to conclude that Plaintiff has carried his

burden of rebutting the presumption of correctness by proving he is not a responsible person or that his failure to pay SS Frames's withholding taxes was not willful.

### 1. Tax Assessment Against Plaintiff Is Not Naked In View Of The De Novo Nature Of These Proceedings

As an initial matter, the Court concludes that the IRS's tax assessment is not a "naked assessment" because it was not "without <u>any</u> foundation whatsoever" when it was imposed. *Janis*, 428 U.S. at 441. Even if it was, however, the Government has adduced more than enough evidence to support the validity of the tax assessment in connection with the present de novo proceedings. In stark contrast, as explained in Section IV.B.2, below, Plaintiff has presented no evidence to rebut the presumption of the assessment's correctness.

First, despite Plaintiff's repeated assertion that the IRS "had <u>no</u> basis to assess personal liability against [Plaintiff] in 2014,"[70] the undisputed evidence shows that the IRS had <u>a</u> basis. As the assessment is not "without any foundation whatsoever," it cannot be considered a "naked assessment." *Janis*, 428 U.S. at 441. Plaintiff's argument that the IRS "had *no factual basis* to support [Officer] Reed's decision"[71] to impose the 2008 tax assessment against Plaintiff overlooks the reality that Officer Reed had some basis even if that basis might be unsatisfactory to Plaintiff.

In this case, before imposing the 2008 tax assessment on Plaintiff, Officer Reed conducted a search of the IRS's IDRS database and found that Plaintiff's social security number was associated with SS Frames as a possible responsible corporate officer.[72] Officer Reed also personally visited the Carson Concrete/SS Frames business address to speak with Plaintiff about

---

[70] Pl.'s Resp. Gov't Mot. Summ. J. 1, ECF No. 31.
[71] Pl.'s Resp. Gov't Mot. Summ. J. ¶ 1, ECF No. 31.
[72] Reed Dep. 34–35, ECF No. 28-10.

SS Frames's unpaid employee withholding taxes.[73]  After the field visit, Officer Reed issued IRS 4180 Summonses to Plaintiff and Carson Concrete's controller and SS Frames's point of contact.[74]  Neither Plaintiff nor Artz chose to respond to the IRS 4180 Summonses.[75]  Then, Officer Reed provided, by certified mail, notices of proposed assessment to Plaintiff in the form of IRS Form 1153.[76]  Again, Plaintiff chose not to respond.[77]  Although IRS Officer Reed's investigation did not meet the standard espoused by taxpayer Plaintiff, Officer Reed's investigation supplied <u>a</u> basis on which to conclude that Plaintiff was responsible for SS Frames's unpaid taxes.  Thus, the 2008 tax assessment is not a "naked assessment" and the usual presumption of correctness applies.[78]

Second, even if this basis did not exist or this basis did not suffice at the time the 2008 tax assessment was imposed, the overwhelming evidence now before the Court in this de novo proceeding provides exceptionally strong justification for the assessment, strong enough, at a minimum, to raise the presumption of the assessment's correctness.

While Plaintiff protests that the "Government's efforts to create a paper record *post hoc* are an affront to Constitutional due process,"[79] Plaintiff's protests are not only without legal support, but they also neglect the reality that Plaintiff received multiple notices and opportunities to be heard, and chose not to respond until after the IRS imposed the tax assessment.  Setting aside Plaintiff's decision not to be heard earlier in the tax assessment process, Plaintiff's argument that the 2008 tax assessment lacks support is undermined by the evidence adduced in

---

[73] Reed Dep. 56:1–14, ECF No. 28-10.
[74] Reed Dep. 18:9–11.
[75] Reed Dep. 74:18–20.
[76] Reed Dep. 74:21–24.
[77] Reed Dep. 43:24–44:2, 74:25–75:2.
[78] Decl. Ruth James, ECF No. 29-5.
[79] Pl.'s Mem. Supp. Mot. Summ. J. ¶ 47, ECF No. 28.

the de novo case before the Court.  As explained in Section IV.A.1, above, "courts have repeatedly held that the government may support a tax assessment based on any admissible evidence, <u>including that first disclosed in discovery</u>."  *Cook*, 46 Fed. Cl. at 115 (emphasis added).

Here, the undisputed facts supporting the 2008 tax assessment are manifold and include, among others:[80]

- Plaintiff was, "from the inception of [SS Frames] Corporation" a "minority shareholder";
- SS Frames began operations in 2003 or 2008;[81]
- In 2008, Plaintiff became the "president" of SS Frames;
- Plaintiff represented to the Pennsylvania Department of Labor and Industry that he was "president" and, rather than a mere minority shareholder, was a "100" percent owner of SS Frames;
- Plaintiff represented to the Pennsylvania Department of Labor and Industry, under penalty of state law, that as president he oversaw SS Frames's "entire operations on a daily basis;"
- Plaintiff was knowledgeable about SS Frames's work and capabilities, which consisted of "[p]oured in place and flat work concrete construction;"
- Plaintiff knew that SS Frames never "had previous workers compensation coverage in Pennsylvania;"
- Plaintiff knew how much SS Frames's insurance cost at various times based on the number of workers employed;
- Plaintiff knew about SS Frames's staffing levels, which were tied to SS Frames's workload;
- Plaintiff's other company, Carson Concrete—which was solely owned by Plaintiff in 2008—contracted with SS Frames for labor on a shared construction project for Drexel University;
- Plaintiff exercised "[o]versight of everything" at Carson Concrete, which included Carson Concrete sometimes reporting SS Frames's employees' wages as Carson Concrete wages, but otherwise reporting SS Frames's workers' insurance claims as belonging to SS Frames;
- SS Frames's business address and phone number were the same as Carson Concrete's business address and phone number;
- When Carson Concrete moved from Conshohocken, PA to Boothwyn, PA, SS Frames moved too;

---

[80] Except where noted, please refer to the Court's recitation of facts in Section II, above, for citations pertinent to this list of facts.

[81] Pl.'s Resp. Gov't's Mot. Summ. J. ¶ 44, ECF No. 31 (admitting that "SS Frames was a corporation that subcontracted labor in the construction business and began operating in 2003").

- Carson Concrete's employees were shared with SS Frames including, for example, project superintendent John Lewis, and controller Robert Artz;
- Carson Concrete's twenty-year veteran controller was listed by Plaintiff himself as a point of contact for SS Frames's dealings with the Pennsylvania State Worker's Insurance Fund;
- Plaintiff signed and submitted tax forms on behalf of SS Frames to the Pennsylvania Department of Labor and Industry while also signing and issuing checks from a Carson Concrete account to pay SS Frames's unemployment compensation liability; and
- Plaintiff continued to submit official paperwork on behalf of SS Frames under penalty of state and federal law as a "manager" at SS Frames through at least 2012.

While these facts are strong enough to support the substantive conclusion that Plaintiff was a responsible person and willfully failed to withhold SS Frames's employees' taxes, these facts, in the first instance, raise the automatic presumption of correctness. Plaintiff's decision to focus on the relative dearth of facts gathered by Officer Reed in connection with the initial 2008 tax assessment is, perhaps, understandable given Plaintiff's failure to adduce any evidence to rebut the presumption of the tax assessment's correctness. Plaintiff's failure, however, necessitates dismissal of his claims because it is Plaintiff's burden to produce evidence that would permit a jury to conclude, by a preponderance of the evidence, that he is not a responsible person. *See generally Brounstein*, 979 F.2d at 955; *Psaty*, 442 F.2d at 1160.

### 2. Plaintiff Cannot Rebut The Presumption Of Correctness

#### i. The Uncontroverted Evidence Shows Plaintiff Is A Responsible Person for § 6672 tax purposes

Faced with a surfeit of evidence demonstrating that Plaintiff is a responsible person for purposes of § 6672, Plaintiff has offered no contrary evidence to support that he is not. Instead, Plaintiff confirmed in his deposition testimony that on several occasions, and under penalty of law, he signed tax returns on behalf of SS Frames, demonstrated his knowledge of and oversight over SS Frames's business, and made representations to state and federal authorities regarding

his role as president and owner of SS Frames. Plaintiff has not adduced any evidence to contradict these facts, facts established by his own statements and by his decisions to sign and certify several official documents. Rather than offer evidence to controvert this evidence, Plaintiff has simply, and incorrectly, attempted to place the burden of proof on the Government even though, as discussed in detail above, the burden of proof in a tax refund case such as this always rests on the taxpayer.

As set forth in detail in Sections II and IV.B.1, above, the evidence shows that Plaintiff had knowledge of and exerted significant control over SS Frames's business. Plaintiff was the sole owner and president of Carson Concrete, which decided to hire SS Frames as a subcontractor on the Drexel University project. Plaintiff, and Carson Concrete, hired SS Frames knowing that Plaintiff was, at its inception, an SS Frames minority shareholder. He then became SS Frames's president and signed official documents certifying that he had become the sole owner of SS Frames. He appointed his twenty-year controller from Carson Concrete, Robert Artz, to be the SS Frames point of contact in connection with a State Workers' Insurance Fund audit. As president of Carson Concrete and president of SS Frames, Plaintiff directed payments out of a Carson Concrete account to pay certain amounts owed by SS Frames while leaving other liabilities unpaid including, for example, SS Frames's federal withholding taxes. Plaintiff's actions establish that he had "significant" if not "exclusive" control over SS Frames. *Quattrone*, 895 F.2d at 927. As Plaintiff exercised "significant control" over SS Frames, then he was a responsible person under § 6672. *Id.*

In the face of this overwhelming evidence, Plaintiff offers no contrary evidence except his bald testimony that SS Frames was owned and operated by two unidentified "minorities . . .

one was black, one was Hispanic."[82]  Presumably, Plaintiff offers up these two unnamed persons as those responsible for SS Frames's taxes in lieu of himself, but Plaintiff has provided no documentary evidence relating to these two persons let alone evidence that these two persons existed.  That Plaintiff has adduced no evidence about these two individuals is particularly confounding given Plaintiff was, by his own admission, a minority shareholder in SS Frames at its inception, Plaintiff hired SS Frames for its labor on the Drexel University project, and SS Frames shared a business address and telephone number with Plaintiff's other solely-owned business, Carson Concrete.

Plaintiff can point to no SS Frames business records or Carson Concrete business records dealing with SS Frame to show that Plaintiff, despite being SS Frames's president and shareholder, did not have significant oversight or control over SS Frames.  Rather, Plaintiff has confirmed by signing and certifying, under penalty of law, that he had oversight over SS Frames's "entire operations on a daily basis"[83] and that on at least two occasions, he decided to pay state taxes owed by SS Frames using funds from Carson Concrete accounts on which Plaintiff was an authorized signatory.[84]

Whereas the totality of the evidence shows that Plaintiff was a responsible person, Plaintiff has adduced no evidence that he was not a responsible person.  Therefore, Plaintiff cannot carry his burden of overcoming the presumption of correctness of the 2008 tax assessment.

---

[82] Samango Dep. 53:9–17, ECF No. 28-2.

[83] Gov't's Mot. Summ. J. Ex. 3, at 2, ECF No. 29-8.

[84] Samango Dep. 29:24–30:17, ECF No. 28-2 (testifying that under Plaintiff's leadership, Carson Concrete paid the Pennsylvania State Worker's Insurance Fund and Pennsylvania unemployment compensation taxes on behalf of SS Frames, and further testifying that, Carson Concrete "may have paid other things [on behalf of SS Frames] that I can't recall.").

ii.        **The Uncontroverted Evidence Shows Plaintiff Was Willful**

Similarly, Plaintiff has adduced no evidence to show that his failure to pay SS Frames's employer withholding taxes was not willful.  Indeed, the undisputed evidence shows that Plaintiff was willful, and even if he was not willful, the evidence nevertheless shows that Plaintiff acted with "reckless disregard for whether taxes ha[d] been paid." *Brounstein*, 979 F.2d at 955–56.  Reckless disregard is enough to meet the willfulness requirement under § 6672 and requires that the taxpayer: "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Vespe*, 868 F.2d at 1335 (internal quotations omitted).[85]

When asked under oath, Plaintiff testified that he did not "take any steps to ensure that [SS Frames's] payroll taxes were in fact being paid to the IRS.[86]  Such an admission coupled with the overwhelming evidence of Plaintiff's responsibility for the taxes and his knowledge of SS Frames's business supports the conclusion that Plaintiff acted willfully.  Even if it does not, however, there exists uncontroverted evidence that Plaintiff ought to have known that there was a grave risk that withholding taxes were not being paid and he was in a position, if not the best position, to find out for certain very easily.

On the uncontroverted facts before the Court, Plaintiff ought to have known that SS Frames was not paying its federal withholding taxes for at least five reasons.

First, while he was president and sole owner of Carson Concrete, Plaintiff hired his other company in which he held a minority share, SS Frames, to perform work on the Drexel University project.  Plaintiff has admitted that he hired SS Frames because he knew that SS

---

[85] Please refer to Section IV.A.4, above, for a discussion of the standard for willfulness under § 6672.

[86] Samango Dep. Vol. II, 54–57, ECF No. 29-22 (testifying that Plaintiff did not take any steps to make sure that SS Frames was paying its employees' payroll taxes).

Frames had no history of worker injuries, which resulted in lower insurance costs and lower labor costs in general. This shows that Plaintiff had, at a minimum, some level of knowledge about SS Frames's business including that SS Frames had no history of worker injuries and that SS Frames's insurance costs were low.

Second, Plaintiff has admitted that he was a part owner of SS Frames, which had the same business address and telephone number as Carson Concrete.

Third, while he may have started out as a part owner of SS Frames, Plaintiff later became SS Frames's president. As president, he verified and signed SS Frames's state tax returns and other documents submitted to state authorities communicating detailed information about SS Frames's business including, for example, SS Frames's employment levels, costs of insurance, and scope of work. Indeed, Plaintiff represented to state authorities that he supervised SS Frames's business on a daily basis. Plaintiff also listed his controller from Carson Concrete as the point of contact at SS Frames for a state audit of SS Frames's workers' insurance coverage.

Fourth, having taken on the mantel of president at SS Frames, Plaintiff learned that SS Frames was not paying state unemployment compensation taxes and failed to make payments to the State Workers' Insurance Fund. Thus, he knew that SS Frames was not complying with, at a minimum, its state legal and financial obligations.

Fifth, Plaintiff admitted that he knew SS Frames had "little experience" in business and subcontracting. By contrast, Plaintiff had, in his own words, extensive business and construction experience from "running a high-rise construction company for 50 years."[87]

With the foregoing context in mind, Plaintiff should have known that SS Frames was not paying its employee withholding taxes and that, in view of SS Frames's inexperience, there

---

[87] Samango Dep. 20:11–21:14, ECF No. 28-2.

persisted a grave risk that the taxes were not being paid. Plaintiff was also, as an owner, president with fifty years of experience running a construction company, and, thus, was well-positioned to find out for certain whether the withholding taxes were being paid. Therefore, when Plaintiff prioritized payments on behalf of SS Frames, namely the State Workers' Insurance Fund and the Pennsylvania unemployment compensation authorities, over the IRS, Plaintiff willfully violated his duties as a responsible person under § 6672 by having paid "other creditors in preference to the IRS . . . with reckless disregard." *Brounstein*, 979 F.2d at 955–56 (quoting *Quattrone*, 895 F.2d at 928 (internal quotations omitted)).

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED. An appropriate Order follows.